```
                                          ┌─────────────────────────────┐
                                          │ USDC SDNY                   │
                                          │ DOCUMENT                    │
                                          │ ELECTRONICALLY FILED        │
                                          │ DOC #: _____      │
                                          │ DATE FILED: _8/2/2016_      │
                                          └─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

TYLER RODRIGUEZ,                            :     **REPORT AND**
                                                  **RECOMMENDATION**
                           Plaintiff,       :     **TO THE HONORABLE**
                                                  **PAUL G. GARDEPHE**
         - against -                        :
                                                  14cv8647-PGG-FM
CITY OF NEW YORK, et al.,                    :

                           Defendants.       :

----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

In this pro se civil rights action pursuant to 42 U.S.C. § 1983 ("Section 1983"), plaintiff Tyler Rodriguez ("Rodriguez") alleges that his constitutional rights were violated while he was an inmate at the Manhattan Detention Complex ("MDC") operated by the New York City Department of Correction. (ECF No. 17 ("Amended Complaint" or "Am. Compl.")). The defendants named in the Amended Complaint are the City of New York ("City"); Antonio Cuin, Warden of the MDC ("Warden Cuin"); Captains Almodovar, Myke, and Williams; and Correction Officers ("C.O.'s") Allen and Williams (collectively, the "Defendants"). Rodriguez principally alleges that, in violation of his constitutional rights, he was threatened by MDC officers and transferred to another facility because he witnessed an assault on another inmate.

The Defendants have moved to dismiss Rodriguez's Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 26). For the reasons set forth below, that motion should be granted in part, and denied in part.

I.    Factual Background

        The following facts are derived from Rodriguez's pleadings,[1] presented in

the light most favorable to him, and assumed to be true for present purposes.

        Rodriguez arrived at the MDC on August 12, 2014, as a sentenced inmate

assigned to a work detail.[2]  (See Compl. at 23).  On the afternoon of September 10, 2014,

he was part of the third floor sanitation team.  (Id. at 5).  While filling a mop bucket in a

closet, he heard a group of five MDC officers[3] and an inmate yelling outside the door.

(Id.).  He attempted to leave the closet, but C.O. Handly told him to "get back in there."

(Id.).  Rodriguez complied, but continued to observe the officers through an opening in

---

[1]      By order dated March 17, 2015, Your Honor cautioned Rodriguez that the
Amended Complaint would "replace, not supplement," the original complaint.  (See ECF Nos. 1
("Complaint" or "Compl."), 15).  It appears that Rodriguez intended the Amended Complaint to
differ from his earlier Complaint only by amending the caption and filling in blanks in the
narrative with the true names of the John Doe defendants.  Despite Your Honor's directive,
however, the Amended Complaint is missing seven substantive pages, (see Compl. at 6, 8, 9, 12,
14, 22, 23), and arranged out of order.  In light of Rodriguez's pro se status, I therefore have
considered both pleadings.  For ease of reference, all citations are to the Complaint.  I further
have presumed that blanks in the Complaint have been completed by inserting the correct names,
where relevant.

[2]      Most of the prisoners at the MDC are pretrial detainees.  See
www1.nyc.gov/site/doc/about/facilities.page (last visited July 29, 2016).  The City indicates,
however, that Rodriguez was a sentenced inmate.  (See ECF No. 27 (Decl. of Asst. Corp.
Counsel Richard Bahrenburg, dated Oct. 9, 2015), ¶ 5).

[3]      It is now clear that these five officers were:  (A) Captain Almodovar, whom
Rodriguez initially identified only by shield number and erroneously believed to be a C.O., (see
Compl. at 1-2, 5; Am. Compl. at 1, 4); (B) C.O. Williams, whom Rodriguez initially identified
only by shield number, (see Compl. at 1-2, 6; Am. Compl. at 1); (C) C.O. Allen, (Compl. at 9);
(D) Captain Myke, whom the City indicated was present, (see ECF No. 13); and (E) C.O.
Handly, a non-party to this action, (Compl. at 5).

the closet door.  (Id.).  He heard Captain Myke[4] yell, "take the handcuffs off this wanna

be gangster he wanna be a t[ough] guy."  (Id.).  Over the inmate's protests, Captain

Almodovar removed the handcuffs and said, "you uncuffed now pop off."  (Id.).  C.O.

Williams then punched the inmate in the face, knocking him to the floor.  (Id. at 6).

      Subsequently, although he could no longer see what was happening,

Rodriguez heard a continued beating while the inmate yelled, "stop stop please please,"

and then, "I[']m g[o]nn[a] sue you mother fuckers this is how you serve y[our] country

this is how you do."  (Id.).  Rodriguez also heard Captain Myke say, "spray him like a

roach," after which someone "sprayed" the inmate (presumably with pepper spray).  (Id.).

Hearing the inmate crying and choking, Rodriguez "step[ped] back in shock," with his

heart "beating fast."  (Id. at 6-7).  Rodriguez started to cough, took out his asthma inhaler,

and was able to use it three times before he "started to choke on [his] spit."  (Id. at 7).

Rodriguez took off his shirt, wet it, and put it around his mouth in an attempt to

counteract the effects of the spray.  (Id.).  He then banged on the closet door and pushed it

open, whereupon one of the officers instructed him to return to the cell block.  (Id.).

      On September 11, the day after this assault, Rodriguez was assigned to

deliver sandwiches to inmates.  (Id. at 9).  After watching Rodriguez for some time, C.O.

Allen said to him, "I've been doing this shit for years an[d] I already know about you so

---

[4]    Rodriguez identifies this individual only as "a capt[a]in."  (Id.).  Since he refers to
the individual later identified as Captain Almodovar as a separate actor in the next sentence of
his narrative, I have assumed that the unidentified captain was in fact Captain Myke, the only
other supervisor present.

if you do[n't] want to take the next bus to Rikers an[d have] good time taken away I su[gg]est you keep it mov[]ing before I write y[our] ass up." (Id.).  That same afternoon, when Rodriguez was back on third floor sanitation duty, Captain Almodovar "pulled [him] out [of] the closet with a mean voice saying what is this I hear you talking . . . about what happen[ed] yesterday. . . .  If I was you I would shut the fuck up an[d] keep y[our] mouth shut about what happen[ed] cause the same shit can happen to you." (Id. at 11). After C.O. Williams asked Captain Almodovar to leave Rodriguez alone, Rodriguez "walked away scared" and spoke to his supervisor before eventually leaving work.  (Id. at 11-12).

One day later, on September 12, Captain Williams[5] informed Rodriguez that someone had contacted the MDC to report that Rodriguez was "hav[]ing a problem with a correctional officer," and asked if Rodriguez wanted to see a psychiatrist.  (Id. at 13).  Rodriguez told Captain Williams that he had been verbally threatened because of what he had witnessed on September 10, but the Captain's only response was that the officers would lie about what happened to "cover their asses for the safety of their job." (Id. at 13-14).  Captain Williams asked Rodriguez to write a statement, but Rodriguez refused.  (Id. at 14-15).  Rodriguez did speak to a psychiatrist, however.  (Id. at 15).

Subsequently, Rodriguez filed a grievance regarding the foregoing incidents and then was transferred from the MDC to Rikers Island.  (See id. at 24).  His attempts to

---

[5]     Captain Williams is someone different than C.O. Williams.  Captain Williams is evidently a supervisor who was not present during the September 10 assault.

appeal that transfer were unsuccessful.  (Id.).  Although Rodriguez does not provide dates

for these events, both obviously occurred by September 25, 2014, when he gave the

Complaint to prison officials for mailing.  (See id. at 27).

II.    Procedural Background

        Rodriguez's Complaint is dated September 25, and was received by the Pro

Se Office on October 28, 2014.  (Id. at 1, 27).  After the City identified three of the John

Doe defendants, (see ECF No. 13), Your Honor directed that Rodriguez file an Amended

Complaint naming them, (see ECF No. 15), which he did on April 2, 2015, (Am.

Compl.).  In both of his pleadings, Rodriguez complains that he was subject to "[c]ruel

and inhumane treatment, loss of work assignment, transfer of [f]acility[,] and [e]motional

distress and [m]ental anguish and duress."  (Compl. at 4; Am. Compl. at 13).  Rodriguez

asks to be "transferred back" to the MDC, and to be "reinstated to [his] work assignment

with back pay."  (Compl. at 25; Am. Compl. at 15).  He also seeks $45,000 in emotional

distress damages.  (Id.).  His request for mandatory injunctive relief is moot since he was

released from custody after this suit was filed.  (See ECF No. 9).

        On October 9, 2015, the Defendants filed their motion to dismiss the

Amended Complaint, which was referred to me on November 30, 2015.  (ECF Nos. 26,

32).  Although the Defendants' motion papers were sent to Rodriguez's last known

address, he has never responded, despite the passage of more than nine months.

III.    Standard of Review

   A Rule 12(b)(6) motion to dismiss for failure to state a claim "tests the legal sufficiency of [a] plaintiff's claim[s] for relief." Krasner v. HSH Nordbank AG, 680 F. Supp. 2d 502, 511 (S.D.N.Y. 2010).  In deciding such a motion, the Court must accept as true all factual allegations made in the complaint and draw all reasonable inferences in favor of the plaintiff. Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006) (citation omitted).  A complaint need not contain "detailed factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Nonetheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555).

   To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).  Determining whether the allegations of a complaint nudge a plaintiff's claims across the line from merely "conceivable to plausible" requires the Court to "draw on its judicial experience and common sense." Id. at 679-80 (citations omitted).  In making its assessment, the Court may consider, in addition to a plaintiff's factual averments, any written instrument upon which the plaintiff necessarily relies, regardless of whether it is attached to the complaint or incorporated therein by reference. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir.

6

2002).  Legal conclusions masquerading as factual averments, however, may not be taken into account.  Twombly, 550 U.S. at 555.

The Court must read pro se pleadings "liberally" and interpret them "to raise the strongest arguments" that they may suggest.  Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (quoting Harris v. City of N.Y., 607 F.3d 18, 24 (2d Cir. 2010)). "Dismissal of a pro se complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements."  Carvel v. Ross, No. 09 Civ. 722 (LAK) (JCF), 2011 WL 856283, at *8 (S.D.N.Y. Feb. 16, 2011).

IV.   Discussion

"To state a claim under [Section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988); accord McKithen v. Brown, 481 F.3d 89, 99 (2d Cir. 2007).  In addition, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983."  Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010) (quoting Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006)).

In this case, construing his pleadings liberally, Rodriguez appears to contend that the Defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, as well as New York state law.  (See generally Compl.; Am. Compl.).  I will address each of these potential claims in turn.

7

A. <u>Eighth Amendment Excessive Force</u>[6]

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. To state an Eighth Amendment claim arising out of the excessive use of force, a prisoner must allege facts satisfying both a subjective and an objective standard. <u>Hudson v. McMillian</u>, 503 U.S. 1, 8-9 (1992). The subjective standard requires that the force be used "maliciously and sadistically to cause harm," rather than "in a good-faith effort to maintain or restore discipline." <u>Id.</u> at 7. To meet the objective standard, a prisoner must show that "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." <u>Id.</u> at 8 (quoting <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991)). This requirement may be satisfied even if the victim does not sustain physical injury, as long as the force used is either more than <u>de minimis</u> or "repugnant to the conscience of mankind." <u>Id.</u> at 9-10 (quoting <u>Whitley v. Albers</u>, 475 U.S. 312, 327 (1986)); <u>see also</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976). In the excessive force context, the Second Circuit has held that any malicious use of force to cause harm is, by definition, repugnant to the conscience of mankind – effectively

---

[6]    In their motion, the Defendants also address a potential Eighth Amendment deliberate indifference to medical needs claim arising out of Rodriguez's interaction with Captain Williams on September 12. (<u>See</u> ECF No. 28 (Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 10-11). To prevail on such a claim, a prisoner must show that (1) objectively, the deprivation of care was a "sufficiently serious" violation of his constitutional rights, and (2) subjectively, that the defendant had a state of mind of "deliberate indifference" to his health or safety. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994). Even construed liberally, however, Rodriguez's pleadings do not suggest that he was denied care – in fact, he clearly states that he accepted Captain Williams' prompt offer to see a psychiatrist. (<u>See</u> Compl. at 13-15). He consequently has failed to state a deliberate indifference claim.

"constitut[ing] an Eighth Amendment violation per se."  United States v. Walsh, 194 F.3d

37, 50 (2d Cir. 1999) (quoting Blyden v. Mancusi, 186 F.3d 252, 263 (2d Cir. 1989)); see

also D'Attore v. N.Y.C. Dep't of Corr., No. 10 Civ. 815 (JSR) (MHD), 2012 WL

4493977, at *13-15 (S.D.N.Y. Sept. 27, 2012) (applying Walsh).

This case differs from the usual excessive force claim since there clearly

was no intent to harm Rodriguez in any way during the September 10 assault.

Nevertheless, "there are a limited number of cases that employ excessive-force analysis

when the plaintiff was not the force's intended object."  Santos v. N.Y.C. Dep't of Corr.,

No. 08 Civ. 8790 (GBD) (THK), 2010 WL 1142066, at *5 (S.D.N.Y. Feb. 25, 2010),

report and rec. adopted, 2010 WL 1142065 (S.D.N.Y. Mar. 25, 2010).  In Santos, for

example, the defendants' motion to dismiss was denied where the correctional officer was

alleged to have intentionally sprayed a fire extinguisher at one inmate, missing him but

inadvertently injuring the plaintiff.  Id. at *7-9.

In arriving at the determination that this stated a claim, Magistrate Judge

Katz relied on the Ninth Circuit's decision in Robins v. Meacham, 60 F.3d 1436 (9th Cir.

1995).  There, a prison guard fired a round of birdshot at an inmate, resulting in injury to

the plaintiff's foot when some of the shot came under his cell door.  The court held that

the trial judge had properly denied summary judgment because there was a material

factual issue as to whether the guard acted to quell a disturbance or simply because the

inmate intended as the target was not locking up quickly enough.  Id. at 1441.  As the

court explained, in the latter case, the guard's malicious and sadistic conduct could give

9

rise to an Eighth Amendment claim because the Supreme Court never has indicated that an excessive force claim requires "a <u>specific</u> intent to harm or punish a <u>specific</u> individual." <u>Id.</u> at 1440 (emphasis in original).

More recently, in <u>Bilan v. Davis</u>, No. 13 Civ. 5509 (RJS) (JLC), 2013 WL 3940532 (S.D.N.Y. July 31, 2013), Magistrate Judge Cott relied on both <u>Santos</u> and <u>Robins</u> in the course of concluding that an inmate "could <u>potentially</u> state a claim for excessive force if he was injured while officers were trying to use excessive force against the non-party inmate." <u>Id.</u> at *7. As these cases establish, if Rodriguez is able to make a plausible showing that MDC officers used excessive force against another inmate, but injured him in the process, he may be able to recover damages on that theory.

Here, Rodriguez alleges that five MDC officers – four of whom are named as defendants in this action – removed another inmate's handcuffs over the inmate's protests, and asked him to "be a t[ough] guy" and "pop off," ostensibly by attacking the officers. When the inmate refused to do so, the officers nonetheless punched him in the face, beat him repeatedly, and sprayed him with a chemical agent. All the while, at least one of the officers knew that Rodriguez was in the closet where he likely could hear, if not see, what was happening. (<u>See</u> Compl. at 5-7). Although Rodriguez complains primarily about the emotional and mental distress that viewing the assault caused him, (<u>see</u> <u>id.</u> at 4, 21-22, 25; Am. Compl. at 13, 15), he also alleges that his inhalation of the chemical agent used on the other inmate caused him to choke and have an asthmatic episode, (<u>see</u> Compl. at 6-7).

10

"While the subjective element of the excessive force standard is inherently an inquiry into [the] defendant's state of mind, [the] plaintiff need not offer particular evidence of [the] defendant's mental state . . . [and may] satisf[y] his burden on this element by merely pleading a scenario in which the use of force could not have been in good faith." Santiago v. Campisi, 91 F. Supp. 2d 665, 673 (S.D.N.Y. 2000); see also Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997) ("Where no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind."). In this case, an unprovoked assault on an inmate who allegedly refused to succumb to the officers' taunts could not have been a good faith use of force or have served a legitimate penological purpose. Rodriguez therefore has alleged facts sufficient to satisfy the subjective component of an Eighth Amendment claim.

Turning to the objective component, because any malicious use of force to cause harm constitutes a per se Eighth Amendment violation, it likewise is satisfied with respect to the September 10 assault. See Walsh, 194 F.3d at 50; see also, e.g., D'Attore, 2012 WL 4493977, at *14 (finding per se violation of Eighth Amendment where case "involve[d] an alleged use of force solely to harm an apparently vulnerable inmate"); Beckford v. Portuondo, 151 F. Supp. 2d 204, 216 (N.D.N.Y. 2001) ("[W]hen a prison guard applies force against a prisoner that poses no reasonable threat simply because the guard loses his or her temper and wishes to wantonly inflict pain on the prisoner, a per se violation of the Eighth Amendment occurs."). This is true despite Rodriguez's limited

11

allegations of physical injury.  See Benjamin v. Flores, No. 11 Civ. 4216 (ARR), 2012

WL 5289513, at *4 (E.D.N.Y. Oct. 23, 2012) ("[E]ven in the absence of significant

injury, if a complaint may be construed to allege the malicious use of force, an excessive

force claim should not be dismissed for failure to state a claim.") (citing Cole v. Fischer,

379 F. App'x 40, 42 (2d Cir. 2010)); see also Wright v. Goord, 554 F.3d 255, 270 (2d Cir.

2009) ("[T]he absence of any significant injury . . . does not end the Eighth Amendment

inquiry, for our standards of decency are violated even in the absence of such injury if the

defendant's use of force was malicious or sadistic.").

            In sum, even if Rodriguez's claim that he suffered severe emotional and

mental distress as a result of witnessing the September 10 assault may be somewhat

farfetched, he has, at this early stage of the proceedings, pleaded facts sufficient to state

an Eighth Amendment excessive force claim based on a transferred intent theory.  As the

Second Circuit recently observed, where "a prisoner's allegations and evidentiary proffers

could reasonably, if credited, allow a rational factfinder to find that corrections officers

used force maliciously and sadistically, [the] Court has reversed summary dismissals of

Eighth Amendment claims of excessive force even where the plaintiff's evidence of

injury was slight and the proof of excessive force was weak."  Harris v. Miller, 818 F.3d

49, 65 (2d Cir. 2016).  It follows that the Defendants are not entitled to dismissal of this

claim at this juncture.[7]

          Moreover, at this stage, Rodriguez need not allege with specificity which of

the four individual defendants present during the September 10 assault – C.O.'s Allen and

Williams and Captains Almodovar and Myke – beat or sprayed the other inmate.

Although Rodriguez must establish personal involvement of the officers in order to

recover compensatory damages against them on his Eighth Amendment claim, Farid, 593

F.3d at 249, an officer "is personally involved in the use of excessive force if the officer

either:  (1) directly participates in an assault; or (2) is present during the assault, and fails

to intercede on behalf of the victim even though he had a reasonable opportunity to do

so," Vesterhalt v. City of N.Y., 667 F. Supp. 2d 292, 297 (S.D.N.Y. 2009) (citing Ricciuti

v. N.Y.C. Transit Auth., 124 F.3d 123, 129 (2d Cir. 1997)).  Rodriguez therefore "need

not establish who, among [the] group of officers, directly participated in the attack and

who failed to intervene, as long as there was a realistic opportunity to intervene to prevent

the harm from occurring."  De Michele v. City of N.Y., No. 09 Civ. 9334 (PGG), 2012

WL 4354763, at *17 (S.D.N.Y. Sept. 24, 2012) (internal quotation marks omitted); see

---

[7]      It is clear, however, that Rodriguez cannot state an Eighth Amendment excessive
force claim based on the events of September 11, when he arguably was threatened by some of
the Defendants.  As a matter of law, verbal abuse, threats, and intimidation standing alone,
unaccompanied by injury or damage, do not amount to a constitutional deprivation.  See Purcell
v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986) (name-calling without "any appreciable injury" is
not a constitutional violation); Jean-Laurent v. Wilkerson, 438 F. Supp. 2d 318, 325 (S.D.N.Y.
2006) ("[V]erbal intimidation does not rise to the level of a constitutional violation.").
Accordingly, insofar as Rodriguez's Eighth Amendment excessive force claims against C.O.
Allen and Captain Almodovar arise out of the September 11 threats, they should be dismissed.

also Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be.").

Accordingly, the Defendants' motion to dismiss Rodriguez's Eighth Amendment excessive force claim against C.O.'s Allen and Williams and Captains Almodovar and Myke, arising out of the September 10 assault, should be denied.

B.    Transfer and Loss of Job Assignment

Rodriguez also alleges that, after he filed a grievance regarding the September 10 assault and September 11 threats, he was transferred from the MDC to Rikers Island, thereby losing his job assignment at the MDC.  (Compl. at 24).  Construing his pleadings liberally, Rodriguez arguably seeks to assert both a Fourteenth Amendment procedural due process claim and a First Amendment retaliation claim based on these facts.

1.    Fourteenth Amendment Procedural Due Process

The Fourteenth Amendment provides that a state may not deprive a person of liberty or property "without due process of law."  U.S. Const. amend. XIV.  To establish a procedural due process claim, a plaintiff first must show that he was deprived of a liberty or property interest.  See Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972); Finley v. Giacobbe, 79 F.3d 1285, 1296 (2d Cir. 1996).  If such a deprivation occurred, the Court then must consider what process was due and whether it was provided.  See Mathews v. Eldridge, 424 U.S. 319, 333-34 (1976).

14

Here, to the extent Rodriguez has attempted to state a due process claim, it clearly falters on the first of these two prongs.  As a general rule, inmates have no constitutional right to be housed in or remain at any particular correctional facility.  See Meachum v. Fano, 427 U.S. 215, 225 (1976) (transfer among correctional facilities, without more, does not violate inmate's constitutional rights, even when conditions in one prison are "more disagreeable" or the prison has "more severe rules"); Prins v. Coughlin, 76 F.3d 504, 507 (2d Cir. 1996) ("[A] prisoner generally has no due process right to challenge a transfer from one facility to another."); Tinsley v. Goord, No. 05 Civ. 3921 (NRB), 2006 WL 2707324, at *5 (S.D.N.Y. Sept. 20, 2006) ("The fact that life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to a less desirable facility.") (internal quotation marks omitted).  Nor does removal from a particular prison job assignment implicate a protected liberty interest.  See Frazier v. Coughlin, 81 F.3d 313, 318 (2d Cir. 1996); Bussey v. Phillips, 419 F. Supp. 2d 569, 579 (S.D.N.Y. 2006).

Accordingly, the Defendants are entitled to dismissal of the Amended Complaint to the extent that Rodriguez seeks to assert a Fourteenth Amendment procedural due process claim as a result of his transfer to Rikers Island and consequent loss of his MDC job assignment.

2.       First Amendment Retaliation

Under Section 1983, a First Amendment retaliation claim "may be brought 'if otherwise routine administrative [prison] decisions are made in retaliation for the exercise of constitutionally protected rights.'" LaBounty v. Gomez, No. 94 Civ. 3360 (DLC), 1997 WL 104959, at *5 (S.D.N.Y. Mar. 10, 1997) (quoting Gill v. Mooney, 824 F.2d 192, 194 (2d Cir. 1987)).  To state such a claim, a plaintiff must allege that:  (a) he was engaged in constitutionally-protected activity; (b) the defendant took adverse action against him; and (c) there was a causal connection between the protected activity and the adverse action.  Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004).  However, "because prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, [courts] are careful to require non-conclusory allegations."  Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (internal quotation marks omitted).

Rodriguez alleges that he was transferred from the MDC to Rikers Island – thereby losing his job assignment at the MDC – in retaliation for his filing of a grievance about the September 10 assault and September 11 threats.  (Compl. at 24).  This is sufficient to establish that he was engaged in a constitutionally protected activity.  See Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996) ("[R]etaliation against a prisoner for pursuing a grievance violates the right[s] . . . guaranteed by the First and Fourteenth Amendments and is actionable under [Section] 1983."); Mateo v. Fischer, 682 F. Supp.

2d 423, 433 (S.D.N.Y. 2010) ("It is well settled that the filing of a prison grievance is a protected activity.").

Rodriguez also has sufficiently alleged an adverse action.  An "adverse action" in this context is defined as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." Pidlypchak, 389 F.3d at 381.  Judged by this standard, it is clear that Rodriguez's transfer from the MDC to Rikers Island was an adverse action.  See Davis v. Kelly, 160 F.3d 917, 920 (2d Cir. 1998) ("[P]rison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights."); Inesti v. Hicks, No. 11 Civ. 2596 (PAC) (AJP), 2012 WL 2362626, at *16 (S.D.N.Y. June 22, 2012) (same).  Moreover, even the mere loss of Rodriguez's job assignment at the MDC could potentially constitute an adverse action.  See Mooney, 824 F.2d at 194 (finding "otherwise routine administrative decisions," such as job transfers, actionable under Section 1983 when made "in retaliation for the exercise of constitutionally protected rights").

Rodriguez further has alleged facts sufficient to show that there was a causal connection between his grievance and his transfer and loss of job assignment.  To allege a sufficient causal connection, Rodriguez's allegations must support an inference that the protected conduct was "a substantial or motivating factor for the adverse actions taken by prison officials." Bennett, 343 F.3d at 137.  Such a causal connection may be shown when the protected activity is followed closely in time by the adverse action.  See Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (passage of six months between the

protected activity and the alleged retaliatory action not too long to support an inference of causal connection).  Although Rodriguez has not specified when he filed his grievance, it is clear that he must have done so by September 25, 2014, when he gave his Complaint to prison officials for mailing.  (See Compl. at 27).  Since his transfer clearly also was effected by that date, there was at most a two-week gap between his grievance and transfer.  Rodriguez therefore has sufficiently alleged a causal connection between his protected activity and the alleged retaliatory action based on temporal proximity alone.

Finally, to the extent that Rodriguez seeks compensatory damages based on his First Amendment retaliation claim, he must establish the personal involvement of the officers.  Farid, 593 F.3d at 249.  To that end, Rodriguez alleges that, on September 11, C.O. Allen threatened him with having to "take the next bus to Rikers" if he did not comply with directives.  (Compl. at 9).  That same afternoon, Captain Almodovar threatened him with physical violence if he did not keep quiet about what he had witnessed on September 10.  (Id. at 11).  And on September 12, after Rodriguez had complained to him about the previous incidents, Captain Williams suggested that the officers involved would lie about what had happened to "cover their asses for the safety of their job."  (Id. at 14).  Construing these facts in the light most favorable to Rodriguez, it is at least plausible that one or more of the Defendants orchestrated Rodriguez's transfer to keep him from speaking up about what he had seen.  When "circumstantial evidence of a retaliatory motive is sufficiently compelling, direct evidence is not invariably required."  Bennett, 343 F.3d at 139.  Rodriguez's case may, of course, be

stronger against some of the officers than others, but at this early stage, he need not allege

exactly how the transfer was arranged.  See Smith v. Levine, 510 F. App'x 17, 20 (2d Cir.

2013) (district court erred by dismissing claim against officers plausibly involved in

retaliatory transfer, despite "sparse descriptions" of one officer's participation).

Accordingly, the Defendants' motion to dismiss Rodriguez's First

Amendment retaliation claim against the individual Defendants should be denied.

C.    Intentional Infliction of Emotional Distress

The Defendants construe Rodriguez's pleadings to include a claim under

New York state law for the intentional infliction of emotional distress.  (See Defs.' Mem.

at 20-25).  They concede that the City timely received a notice of this claim from

Rodriguez, but contend both that the notice was deficient, (id. at 21-23), and that even a

properly noticed intentional infliction of emotional distress claim would be meritless, (id.

at 23-25).  There is no need to address the procedural point because the Defendants'

substantive argument clearly is correct.

Rodriguez alleges that, as a result of witnessing the September 10 assault,

he began taking psychiatric medication, suffers from nightmares, flashbacks, and

depression, and "hear[s] that inmate yell throughout the day in [his] mind over and over

and over again."  (Compl. at 21-22).  He similarly alleges that, after being threatened, he

was in constant fear for his life, and "paranoid" and "jumpy" around correctional officers.

(Id.).

19

Under New York law, an intentional infliction of emotional distress claim requires proof of four elements:  "(1) extreme and outrageous conduct[;] (2) intent to cause severe emotional distress[;] (3) a causal connection between the conduct and the injury[;] and (4) severe emotional distress."  Bender v. City of N.Y., 78 F.3d 787, 790 (2d Cir. 1996) (citing Holwell v. N.Y. Post Co., 81 N.Y.2d 115, 121 (1993)).  The first of these elements requires the alleged misconduct to be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303 (1983) (quoting Restatement of Torts (Second) § 46 cmt. d (1965)).  This is a difficult showing to make.  Indeed, as the New York Court of Appeals noted in Holwell, every such claim to have come before the court has failed "because the alleged conduct was not sufficiently outrageous."  81 N.Y.2d at 122; accord Chanko v. Am. Broad. Co., 27 N.Y.3d 46, 57 (2016).  Whether the conduct in this case meets the threshold is a question of law for the Court to decide.  Sgarlata v. Viacom, Inc., Nos. 02 Civ. 7234, 03 Civ. 5228 (RCC), 2005 WL 659198, at *8 (S.D.N.Y. Mar. 22, 2005).

Suffice it to say, even if Rodriguez is given the benefit of every conceivable doubt, he has failed to allege intentional conduct by any of the Defendants sufficiently outrageous to give rise to an intentional infliction of emotional distress claim, no matter how distressed he may have been.  Accordingly, to the extent that Rodriguez asserts a state law intentional infliction of emotional distress claim, it should be dismissed.

D.      Claims Against the City and Warden Cuin

Rodriguez's only surviving claims are (1) an Eighth Amendment excessive

force claim against C.O.'s Allen and Williams and Captains Almodovar and Myke,

arising out of the September 10 assault on another inmate, and (2) a First Amendment

retaliation claim against C.O.'s Allen and Williams and Captains Almodovar, Myke, and

Williams.  Rodriguez, however, has failed to allege facts sufficient to hold either the City

or Warden Cuin liable for these violations.

1.      Municipal Liability

To prevail on a claim of municipal liability, a plaintiff must include in his

complaint factual allegations suggesting the existence of an officially-adopted policy or

custom of the municipality that caused his injury.  See Bd. of Cnty. Comm'rs v. Brown,

520 U.S. 397, 403-04 (1997); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

A plaintiff need not identify an express rule or regulation:  "[i]t is sufficient to show, for

example, that a discriminatory practice of municipal officials was so 'persistent or

widespread' as to constitute 'a custom or usage with the force of law.'"  Patterson v.

Cnty. of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004) (quoting Sorlucco v. N.Y.C.

Police Dep't, 971 F.2d 864, 870-71 (2d Cir. 1992)).

In his Amended Complaint, Rodriguez alleges only that his rights were

violated.  This does not amount to a showing that he was the victim of a  policy or custom

giving rise to municipal liability.  See Ricciuti, 941 F.2d at 123 ("[A] single incident

alleged in a complaint, especially if it involved only actors below the policy-making

21

level, does not suffice to show a municipal policy.").  Indeed, Rodriguez has failed to

allege that there were any other incidents of inmate assaults or retaliatory transfers, and

has not even suggested the existence of a policy or custom.  This is insufficient to state a

claim against the City.  See McAllister v. N.Y.C. Police Dep't, 49 F. Supp. 2d 688, 705

(S.D.N.Y. 1999) ("Conclusory allegations of a municipality's pattern or policy of

unconstitutional behavior are insufficient to establish a Monell claim, absent evidence to

support such an allegation.").  Accordingly, Rodriguez's claims against the City should

be dismissed.[8]

     2.   Warden Cuin

     In Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995), the Second Circuit held

that a plaintiff may establish a prison supervisor's personal involvement by showing that

the supervisor either:  (a) "participated directly in the alleged constitutional violation;" (b)

"failed to remedy" the violation "after being informed of the violation through a report or

appeal;" (c) "created a policy or custom under which unconstitutional practices occurred,

or allowed the continuance of such a policy or custom;" (d) "was grossly negligent in

supervising subordinates who committed the [violation];" or (e) "exhibited deliberate

---

[8]    There is no indication that Rodriguez seeks to name any of the individual
defendants in their official capacities.  Moreover, a damages claim against an official can only be
asserted under Section 1983 if the official is sued in his personal capacity.  Al-Jundi v. Estate of
Rockefeller, 885 F.2d 1060, 1065 (2d Cir. 1989).  Even if that were not so, "an official-capacity
suit is, in all respects other than name, to be treated as a suit against the entity [of which the
officer is an agent]."  Kentucky v. Graham, 473 U.S. 159, 166 (1985).  Accordingly, if
Rodriguez had named the individual defendants in both their official and personal capacities, the
official capacity claims would have to be dismissed for the same reason that the City is entitled
to dismissal.

indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." Id. at 873; accord Mateo v. Fischer, 682 F. Supp. 2d 423, 429-30 (S.D.N.Y. 2010). It is unclear whether, and to what extent, the five Colon categories have survived the Supreme Court's decision in Iqbal, 556 U.S. at 662. See Marom v. City of N.Y., No. 15 Civ. 2017 (PKC), 2016 WL 916424, at *14-15 (S.D.N.Y. Mar. 7, 2016). In any event, merely pleading that a defendant is a high-ranking prison official plainly is insufficient to establish personal involvement. Bellezza v. Holland, 730 F. Supp. 2d 311, 317 (S.D.N.Y. 2010) (citing Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985)).

Rodriguez has named as a defendant Warden Cuin, who was the superintendent of the MDC in 2014. He has not alleged, however, that Warden Cuin was personally involved in any of the incidents giving rise to this suit. Nor has he suggested that Warden Cuin encouraged, or was even aware of, the physical or verbal aggression of the other MDC officers or their participation in any retaliatory transfer. Indeed, Warden Cuin's name appears only in the caption, with no mention of him in the narrative. Accordingly, the Defendants' motion to dismiss all claims against Warden Cuin should be granted. See Carrasquillo v. City of N.Y., 324 F. Supp. 2d 428, 435 (S.D.N.Y. 2004) (dismissing a complaint against named defendants not discussed in complaint).

E.    Qualified Immunity

The Defendants also contend that the individual defendants are entitled to qualified immunity. Insofar as relevant, the Defendants assert that "there is no clearly

established constitutional right to be free from merely witnessing force used on another individual," or, in the alternative, that it was objectively reasonable for the officers to believe that "using force on one individual would not violate the constitutional rights of another individual." (See Defs.' Mem. at 18). Curiously, they do not address the applicability of qualified immunity to Rodriguez's First Amendment retaliation claim.

      The doctrine of qualified immunity entitles government actors performing discretionary functions to be shielded from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Walczyk v. Rio, 496 F.3d 139, 154 (2d Cir. 2007) (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)) (emphasis omitted).

      At this early stage of the litigation, there is nothing to suggest that the rights underlying Rodriguez's surviving claims were not well established. "It is indisputable that freedom from the use of excessive force is a clearly established constitutional right." Atkins v. Cnty. of Orange, 372 F. Supp. 2d 377, 401 (S.D.N.Y. 2005). It is equally clear that a reasonable officer would have known that the malicious use of force for no penological purpose is unlawful. While creative, the Defendants' apparent argument that the officers are absolved of responsibility because their

unconstitutional use of force had an unknown consequence fails.  See, e.g., Robins, 60

F.3d at 1442 (9th Cir. 1995) ("This situation presents no new principles of which the

officers could not have reasonably been aware regarding the constraints which the Eighth

Amendment places on the actions of prison officials.").  Similarly, "[r]etaliation claims

have long been a fixture of First Amendment law.  "Only a 'plainly incompetent' officer

– or one who was intentionally violating the Constitution – would think it permissible to

single out an inmate for adverse action because he spoke out against something that

happened . . . in the prison."  Vincent v. Sitnewski, 117 F. Supp. 3d 329, 342 (S.D.N.Y.

2015) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011)).  The Defendants therefore

are not entitled to qualified immunity with respect to Rodriguez's surviving claims.

      F.     Section 1997e(e)

      Finally, the Defendants argue that Rodriguez is not entitled to recover

damages for mental and emotional injuries because he has not alleged physical injury.

(Defs.' Mem. at 14-15).  The Prison Litigation Reform Act ("PLRA") provides in that

regard that "[n]o Federal civil action may be brought by a prisoner confined in a jail,

prison, or other correctional facility, for mental or emotional injury suffered while in

custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e) ("Section

1997e(e)").  Courts have interpreted this language to mean that a prisoner "cannot recover

damages for mental or emotional injury for a constitutional violation in the absence of a

showing of actual physical injury."  Thompson v. Carter, 284 F.3d 411, 417 (2d Cir.

2002).  Section 1997e(e), however, does not contain any limitations on injunctive and

declaratory relief, nominal and punitive damages, or damages for a mental or emotional

injury suffered in addition to a physical injury.  See id. at 418-19.

At the outset, the Defendants mistakenly assume that, when no physical

injury is alleged, the only injury that a plaintiff may suffer as a result of retaliation is

mental or emotional harm.  The Second Circuit has held, however, that intangible

deprivations of liberty and personal rights are distinct from claims for pain and suffering,

mental anguish, and mental trauma.  See Kerman v. City of N.Y., 374 F.3d 93, 125 (2d

Cir. 2004) ("The damages recoverable for [a plaintiff's Fourth Amendment claims] are

separable from damages recoverable for such injuries as physical harm, embarrassment,

or emotional suffering.").  Accordingly, the PLRA's physical injury requirement does not

bar an award of compensatory damages for First Amendment violations.  Rosado v.

Herard, No. 12 Civ. 8943 (PGG) (FM), 2013 WL 6170631, at *10-11 (S.D.N.Y. Nov. 25,

2013); see also Lipton v. Cnty. of Orange, N.Y., 315 F. Supp. 2d 434, 457 (S.D.N.Y.

2004) (an exception to the PLRA's physical injury requirement exists where a prisoner's

claims arise under the First Amendment); Cancel v. Mazzuca, 205 F. Supp. 2d 128, 138

(S.D.N.Y. 2002) (the PLRA "does not present an obstacle to" First Amendment claim).

Furthermore, even when a claim is potentially subject to the PLRA's

limitation, the prisoner need not plead physical injury in his complaint.  Rosado, 2013

WL 6170631, at *11 (denying motion to limit damages pursuant to Section 1997e(e)

because, "at the motion to dismiss stage, the Court cannot, and need not, conclusively

resolve the factual question of whether or not the plaintiff suffered physical injury in

26

addition to his claimed mental and emotional injury") (quoting <u>Frieson v. City of N.Y.</u>,
No. 11 Civ. 4611 (JGK), 2012 WL 1948782, at *2 (S.D.N.Y. May 30, 2012)).  In any
event, Rodriguez has in fact pleaded some facts potentially suggesting physical injury –
namely, that his inhalation of the chemical agent used on the other inmate caused him to
choke and have an asthmatic episode.  (<u>See</u> Compl. at 6-7).  The Defendants' request to
foreclose Rodriguez from receiving any compensatory damages therefore is premature.

V.   <u>Conclusion</u>

For the foregoing reasons, the Defendants' motion to dismiss the Amended
Complaint, (ECF No. 26), should be granted in part, and denied in part.  Specifically, the
motion should be denied with respect to Rodriguez's Eighth Amendment excessive force
claim against C.O.'s Allen and Williams and Captains Almodovar and Myke, arising out
of the September 10 incident, as well as his First Amendment retaliation claim against
those defendants and Captain Williams.  All other claims that Rodriguez asserts should be
dismissed.

VI.   <u>Notice of Procedure for Filing Objections to this Report and Recommendation</u>

The parties shall have fourteen days from the service of this Report and
Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule
72(b) of the Federal Rules of Civil Procedure.  <u>See also</u> Fed. R. Civ. P. 6(a) and (d).  Any
such objections shall be filed with the Clerk of the Court, with courtesy copies delivered
to the chambers of the Honorable Paul G. Gardephe, to my chambers at the United States
Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties.  <u>See</u>

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of

time for filing objections must be directed to Judge Gardephe.  The failure to file these

timely objections will result in a waiver of those objections for purposes of appeal.  See

Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72(b).

                      SO ORDERED.


Dated:        New York, New York
                August 2, 2016

                                              FRANK MAAS
                              United States Magistrate Judge

Copies to:

Tyler Rodriguez (via U.S. Mail)
149 Stephens
Apartment #1
Bronx, New York 10473

Corporation Counsel (via ECF)